IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

JOYCE KRAJICEK, a/k/a JOYCE          )
PERDUE, and PHILLIP PERDUE,          )
                                     )
          Plaintiffs,                )
                                     )
vs.                                  )          No.  08-CV-714-TCK-FHM
                                     )
AUTOMOBILE CLUB INTER-               )
INSURANCE EXCHANGE, INC.,            )
a/k/a AAA INSURANCE,                 )
                                     )
          Defendant.                 )

## OPINION AND ORDER

Before the Court is Defendant's Motion for Summary Judgment (Doc. 27).

I.     **Factual Background**

       A.     Joyce's Prior Injuries[1]

       At certain relevant times, Plaintiff Joyce Perdue ("Joyce")[2] worked as a recovery room nurse

at Saint Francis Hospital, and part of her job responsibilities included lifting patients.  On March 9,

1992, Plaintiff experienced pains while assisting in lifting a patient.  In May 1992, Dr. David Fell

("Fell") evaluated Joyce, concluded that she had "protrusion of the C5-6 and C5-7 disks with some

foraminal narrowing on her right side which is her symptomatic arm," prescribed her medication,

and recommended that she refrain from taking care of recovery room patients.  (5/19/92 Letter,

_____

[1]     As part of its summary judgment record, Defendant submitted medical records regarding
certain events and injuries which occurred prior to the August 21, 2005 accident (the
"Accident") that is the subject of this lawsuit.  (*See* Def.'s Mot. for Summ. J., Exs. 1-2.)
Such evidence is summarized below.

[2]      At relevant times, Joyce was also known as Joyce Krajicek.

Def.'s Mot. for Summ. J., Ex. 1 at 7.)   In March 1996, Joyce returned to Fell because "she continue[d] to have problems with the cervical spine, and pain radiating into the shoulders and arms, right worse than left."   (3/5/96 Letter, Def.'s Mot. for Summ. J., Ex. 1 at 5.)   Fell noted a "[p]ersistent C7 radicular irritation, right worse than left, secondary to known disc degeneration and spondylosis at C5-6 and C6-7" and a "[k]nown disc protrusion at C5-6, which is predominantly right of midline" and prescribed her medication.   (*Id.*)   In January 1997, Fell evaluated Joyce again and reached a similar conclusion but did not give Joyce any "final rating" for purposes of worker's compensation.   (1/21/97 Letter, Ex. 1 to Def.'s Mot. for Summ. J., at 3.)

On January 4, 1999, Dr. Kenneth Trinidad evaluated Joyce for purposes of a worker's compensation claim and concluded:

> [B]ased upon injuries which occurred while in the employ of St. Francis Hospital, Inc. on or about March 9, 1992, in my opinion [Joyce] has an 18 percent permanent partial impairment to the whole man as contributed by injuries to the cervical spine, a 2 percent permanent partial impairment to the whole man as contributed by injuries to the thoracic spine, and a 14 percent permanent partial impairment to the whole man as contributed by injuries to the lumbar spine.

(1/4/99 Letter, Ex. 2 to Def.'s Mot. for Summ. J., at 5.)   On November 17, 1999, Judge Kenneth Fulton found that, as a result of the March 9, 1992 workplace injury, Joyce "sustained 17 percent permanent partial disability to the BODY AS A WHOLE due to injury to the NECK . . . and 8 percent permanent partial disability to the LUMBAR BACK."   (Order Awarding the Nature and Extent of Permanent Partial Disability, Ex. 2 to Def.'s Mot. for Summ J., at 4.)   Joyce's medical records further indicate that, at some point in 2004, Joyce was in a side-impact motor vehicle accident.   This occurred prior to the Accident giving rise to this lawsuit.

2

B.      The Accident

On August 21, 2005, Joyce and her husband, Plaintiff Phillip Perdue ("Phillip") (collectively "Plaintiffs") were involved in an automobile accident ("Accident") in their 1999 Toyota Avalon ("Toyota"). Phillip was the driver, and Joyce was the passenger. Plaintiffs were stopped behind a driver making a left-hand turn on State Highway 85 near Cleora, Oklahoma, when they were hit from behind by Amanda Doublehead ("Doublehead"). Doublehead was driving a Nissan Pathfinder insured by State Farm Insurance Company ("State Farm"). The record is not clear as to how fast Doublehead was traveling at the time of impact. However, the police report indicates that Doublehead's vehicle left approximately 44 feet of skid marks after impact, Phillip testified that Doublehead's vehicle never slowed down prior to impact, and Joyce testified that she estimated the vehicle to be traveling 55-60 miles per hour. It is undisputed that the impact "knocked the whole back end of the car up into the roofline and buckled it up, sprang open both the back doors," and caused the front seats to collapse backwards, such that Plaintiffs ended up on their backs. (*See* Phillip Perdue Dep., Ex. 3 to Pls.' Resp. to Def.'s Mot. for Summ. J., at 11-12.) Plaintiffs both exited the vehicle. The police and ambulance came to the scene, although Plaintiffs were not transported to the emergency room or hospital. Approximately five hours after the accident, Plaintiffs presented themselves to MedCenter, in Tulsa, Oklahoma. Joyce complained of neck pain, and Phillip complained of neck and upper back pain. At the time of the Accident, Joyce was 59 years old, and Phillips was 60 years old.

C.      The Policy

When the Accident occurred, the Toyota was insured by Defendant Automobile Club Inter-Insurance Exchange ("AAA"), Policy No. A8-614733-1 ("Policy"). The Policy lists both Plaintiffs

as insured and lists Allison Pittman ("Pittman") as Plaintiffs' sales agent.  Pursuant to the Declarations associated with the Policy, Plaintiffs had a $5,000 coverage limit for medical payment ("Med Pay") benefits, and a "$50/100" coverage limit for Uninsured Motorist ("UM") benefits.  (*See* Declarations Page to Policy, Ex. 6 to Def.'s Mot. for Summ. J.)  In order to receive Med Pay benefits under the Policy, the medical bills must be incurred within one year from the date of the Accident. There is no similar time limit applicable to UM benefits.  The Med Pay and UM benefit limits applied individually to each "covered person" in an accident.  It is undisputed that both Plaintiffs qualified as "covered persons" for purposes of the Accident.  Therefore, under the Policy, Joyce and Phillip were covered in the maximum amount of $5,000 each for Med Pay benefits and $50,000 each for UM benefits.

      D.    <u>Claim-Handling Process</u>

On August 22, 2005, Joyce contacted AAA to report the Accident.  The Accident was assigned Claim No. PA0000801372 and originally assigned to Claims Representative Michelle Palmer ("Palmer").  Later that day, Palmer contacted Joyce and took her statement regarding the Accident.  Palmer claims that, during this call, she informed Plaintiff of UM coverage under the Policy.  (*See* Aff. of Michelle Palmer, Ex. 8 to Def.'s Mot. for Summ. J., at ¶ 3 (declaring that the inclusion of "EXPLAINED CVG/DED" in her claim notes indicates to her that she "followed my habit and routine of explaining to the insured . . . all potential coverages under the policy and any applicable deductibles, including . . . [UM]").)  Joyce denies that any AAA representative informed her about the possibility of UM coverage and claims that, when she complained about receiving only $5,000 in Med Pay benefits, she was told that the $5,000 was all AAA "was going to pay."  (*See*

Joyce Perdue Dep., Ex. 2 to Pl.'s Resp. to Def.'s Mot. for Summ. J., at 22:20-23:4; *see also id.* at 18:4-17; 20:3-17.)

On September 21, 2005, AAA paid Plaintiffs for their vehicle damage and were subsequently reimbursed by State Farm. From October 24, 2005 to around December 2005, Plaintiffs submitted certain medical bills, and these bills were paid by AAA. In claim notes entered on December 30, 2005, Palmer stated "no add'l bills" and "claim closed." (Claim Notes, Ex. 7 to Def.'s Mot. for Summ. J., at 9.) On March 14, 2006, AAA received a fax from Plaintiffs stating that outstanding medical bills had not been paid. On June 6, 2006, the claim was reopened and reassigned to Rosemary Mowry ("Mowry") for the purpose of finalizing "MP CLAIMS." (*See id.* at 11.) In September 2006 and April 2007, AAA's claim notes indicate that it made additional Med Pay payments to Plaintiffs in various amounts.

On April 6, 2007, Mowry sent Joyce a letter ("Exhaustion Letter") stating:

> Your Medical Pay Limits are $5,000. We have issued payments in the amount of $5,000, exhausting your limits. At this time we are unable to issue any further payments for medical treatment you receive. Upon our receipt of any further requests for payment we will advise each provider that we have exhausted your Personal Injury Protection limits and are unable to issue payment.

(Exhaustion Letter, Ex. 8 to Pl.'s Resp. to Def.'s Mot. for Summ. J.)[3] This letter was silent as to the possibility of UM coverage for Joyce. Claim notes entered by Mowry on April 6, 2007 indicate that the claim was again closed. As of April 6, 2007, the claim notes contain no explicit mention of UM coverage or any other indication that AAA evaluated the amount of Doublehead's policy limits for purposes of evaluating Plaintiffs' entitlement to UM coverage.

---

[3]   Phillip was not sent a similar letter because his medical bills never reached $5,000. Phillip's medical bills related primarily to treatment for a ringing or throbbing in his ears ultimately diagnosed as "tinnitus."

Following exhaustion of her $5,000 in Med Pay benefits, Joyce continued incurring medical

bills.[4] Joyce testified that she called AAA to complain about her lack of payment on her additional

medical bills, either from AAA or State Farm.

> And during that time [prior to hiring an attorney], I was sending all my – my bills to
> both State Farm and AAA.  And AAA paid the $5,000 and said they wouldn't pay
> any more, that was all the medical bills that they were going to – all the money that
> they were going to pay because I only had a $5,000 medical. And then later as I was
> doing this, I was saying, "Well, I have all these bills . . . I don't understand.  And my
> husband's still hasn't been paid."  And I was asking all this stuff, and actually the
> person I was talking to at AAA told me that I ought to get an attorney.

(Joyce Perdue Dep., Ex. 2 to Pl.'s Resp. to Def.'s Mot. for Summ. J., at 18:7-17.)   Sometime

following this conversation, Plaintiffs contacted an attorney.  On June 4, 2007, Plaintiffs' counsel

Cindy McNeely ("McNeely") sent AAA a request for all bills and records.  On June 4, 2007, upon

being contacted by McNeely, Semler requested that Mowry:

> 1) PLEASE RECAP WHAT THE INJURIES ARE, TX, ETC FOR EACH.
> 2) DO WE HAVE A UIM EXPOSURE?  WHAT ARE STATE FARM'S LIMITS?
> IT WOULD SEEM THAT PHILLIP WOULDN'T HAVE ONE BASED ON THE
> MEDS WE HAVE PAID.

(6/4/07 Claim Notes, Ex. 7 to Def.'s Mot. for Summ. J., at 15.)  On July 9, 2007, McNeely advised

Mowry that Joyce was "still in pain" and that Phillip had "ringing in his ear." (*Id.* at 16.)  According

to the claim notes, Mowry received a letter from State Farm on July 11, 2007 indicating that State

---

[4]     The record is not clear as to the total amount of medical bills Joyce submitted prior to her
receipt of the Exhaustion Letter.  However, according to June 4, 2007 claim notes entered
by Kevin Semler ("Semler"), Mowry's supervisor, it appears that Joyce had submitted a total
of $8,190.22 in medical bills, while Phillip had submitted a total of $4,362.72.

Farm's policy limits were "25/50." (*Id.* at 17.)[5]  On July 13, 2007, Plaintiffs' claim was reassigned

to Pennie Brocato ("Brocato").

On August 2, 2007, Dr. Benjamin Benner ("Benner") wrote a letter ("8/2/07 Letter") to Joyce

stating as follows:

> I have had a chance to review your studies.  As you know, our group has followed you for an extended period of time.  You know that you have had some cervical radiculitis in the past and have sustained injuries including a 1992 Workers' Comp injury, and a 2004 side-impact motor vehicle accident.  *It was noted that although you received physical therapy your complaints cleared and you were back to baseline with no additional complaints or impact on your lifestyle or work until August of 2005, at which time you were stopped, and rear-ended.*
>
> Since the time you were seen at the medical emergency center until now, you have had persistent complaints in your neck associated with headaches, catch in your neck and some changes in your right upper extremity strength.  I re-evaluated you for this on January 12, 2006.  My examination included a review of your MRI scan which demonstrated the disc changes at C5-6 and C6-7 with some narrowing of the canal.  *This does produce a potential for you to have nerve root irritation or injury when your neck was brought through a range of motion in the accident.  We continue to treat you on a regular basis, trying various anti-inflammatory, anti-neurotics and therapy.  Eventually, we were forced to offer you an epidural steroid injection, first on February 28, 2007, and more recently, on July 18th.  These have provided some symptomatic improvement, but it is not clear at this time how long-standing these will be.*
>
> At the present time, I hope we can avoid surgery, *but I cannot rule that out as a possibility*.  I will be involved in either a two-level fusion or sitting cervical foraminotomy to decompress it.
>
> In the meantime you should continue your prescription medicines, monitoring your activity at work, and utilizing the home exercise program that was outlined in physical therapy.  I hope this information is helpful for your case.

(8/2/07 Letter, Ex. 14 to Pl.'s Resp. to Def.'s Mot. for Summ. J (emphasis added).)  The record is

not clear as to precisely when AAA received the 8/2/07 Letter, although Plaintiff alleges that AAA

---

[5]     It is not disputed that Doublehead's State Farm bodily injury policy limit applicable to each Plaintiff is $25,000.  As explained below, this amount is relevant to AAA's decision to deny UM benefits.

was in possession of the 8/2/07 Letter at least by November 13, 2007.  (*See* Pl.'s Resp. to Def.'s Mot. for Summ. J. ¶ 27.)

On August 10, 2007, Brocato completed a Claims Outcome Advisor Common Law Assessment ("Assessment") for Joyce's claim.[6]  Brocato concluded that Joyce suffered between $6,300 - $8,400 in "General Damages," and $8,221 in "Accepted Medical," for a "Total Net Damages" amount of $14,521 - $16,621.  (Assessment, Ex. 9 to Def.'s Reply, at 6.)  Brocato assigned no amount to "future care."  (*Id.*)  The Assessment describes Joyce's injury as an "[a]ggravation of pre-existing cervical spondylosis - asymptomatic at time of accident" and states that "[i]nsd has had prior neck and back problems, but was allegedly asymptomatic at time of this accident."  (*Id.* at 7, 9.)  Claim notes entered by Brocato on August 10, 2007 provide:  "Based on [Joyce's] injuries, prior issues and medical that has been submitted and reviewed so far, I feel that [Doublehead's] underlying limits of $25/50 are sufficient to cover the claim."  (Claim Notes, Ex. 7 to Def.'s Mot. for Summ. J., at 20.)  With respect to Phillip, the claim notes provide: "He was dx w/tinnitus, but this was the first mention of this problem and I'm not convinced i[t] is accident related.  At any rate, underlying limits are $25/$50 and I believe that it is clear, based on what has been submitted so far, that UIM will not apply in this case." (*Id.*)  Also on August 10, 2007, Brocato sent a letter to McNeely stating:

> I am writing regarding the Uninsured Motorist claims pending on your above captioned clients.  Based on my review of the medical that has been submitted so far, I feel that the underlying limits with State Farm Insurance are sufficient to cover your client's injury claims. . . . Our file will remain open and we will consider any additional information that you might submit for review.

---

[6]     The record is not clear as to whether Brocato was in possession of the 8/2/07 Letter at the time of the Assessment.

(8/10/07 Letter, Ex. 9 to Def.'s Mot. for Summ. J., at 3.)

According to claim notes entered August 28, 2007, McNeely sent additional medical records to Brocato and made a demand for the UM policy limit for each party, for a total of $100,000. Brocato stated her opinion in these notes that "[i]f I evaluated the claims for any amount over the underlying limit, then I may have to pay up to our limit, but I believe that is only if I evaluate it over the underlying limit.  I will call Atty Adam Weintraub to confirm." (Claim Notes, Ex. 7 to Def.'s Mot. for Summ. J., at 22.)  Claim notes entered September 5, 2007 indicate that this attorney confirmed Brocato's understanding of the law.

By November 13, 2007, McNeely made another demand for UM policy limits.  On the same date, Brocato stated in the claim notes:

> Atty Cindy McNeely sent a few more meds.  My file now shows Joyce's specials to be $17,000.  Atty had made another demand for our UIM policy limit of $50K. Underlying [Doublehead] BI limit is $25/$50. I still feel that clmts injuries are w/in that limit.  *I feel that clmts tx is excessive for the soft tissue injuries that she was dx and no matter what her bills are at this point, I don't feel that the value of the claim exceeds the underlying limit.*

(Claim Notes, Ex. 7 to Def.'s Mot. for Summ. J. at 23 (emphasis added).)  On the same date, Brocato sent a letter to McNeely consistent with the claim notes, stating:

> After review of the additional medical, I would like to inform you that my position of this claim remains the same.  *Your client's treatment appears to be excessive considering her injury diagnosis and I do not feel that her claim value exceeds the underlying Bodily Injury limit.*  Again, this is based only on what you have submitted so far. . . . [M]y file will remain open for ongoing review should you wish to submit additional medical bills.

(11/13/07 Letter, Ex. 9 to Def.'s Mot. for Summ. J (emphasis added).)  On December 20, 2007, McNeely informed Brocato that State Farm had offered their policy limits and "reiterated her demand of UIM limit of $50K." (Claim Notes, Ex. 7 to Def.'s Mot. for Summ. J., at 23.)  McNeely

9

did not submit any additional medical records, and Brocato stated in the claim notes that her position remained the same.

       E.    <u>Filing of Lawsuit</u>

On June 12, 2008, Plaintiffs filed this lawsuit in the District Court for Tulsa County, asserting causes of action against AAA for breach of contract and violation of the duty of good faith and fair dealing owed to an insured under Oklahoma law.  Plaintiffs requested judgment on their breach of contract claim "in the amount of their policy limits of $100,000," damages in excess of $10,000 on their bad-faith claim, and punitive damages in excess of $10,000.  The case was removed to this Court without objection and is set for a non-jury trial on the October 2009 trial docket.[7]  On July 17, 2009, AAA moved for summary judgment on Plaintiffs' claims for bad faith and punitive damages.

## II.    **Summary Judgment Standard**

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006) (citation omitted).  The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party.  *Id.* (citation omitted).  However, the party seeking to overcome a motion for summary judgment may not "rest

---

[7]    The Joint Status Report states that there is no jury demand.  The Court's Scheduling Order, which has been in effect since January 26, 2009, indicates that the matter is set for a non-jury trial.  Defendant's motion for summary judgment states that the matter will be tried to the Court, and Plaintiffs' response does not state otherwise.  On September 25, 2009, Plaintiffs filed Proposed Findings of Fact and Conclusions of Law.  Nonetheless, on September 30, 2009, Plaintiffs also filed proposed jury instructions and voir dire.  The Court assumes the September 30, 2009 submissions were in error.

on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  The party seeking to overcome a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986).

## III.   Discussion

The elements of a bad faith claim against an insurer for delay or non-payment of coverage are:  (1) claimant was entitled to coverage under the insurance policy at issue; (2) the insurer had no reasonable basis for delaying or denying payment; (3) the insurer did not deal fairly and in good faith with the claimant; and (4) the insurer's violation of its duty of good faith and fair dealing was the direct cause of the claimant's injury.  *Ball v. Wilshire Ins. Co.*, ___P.3d ___, 2009 WL 1679954, at * 5 (Okla. 2009).  "A party prosecuting a claim of bad faith carries the burden of proof and must plead all the elements of the intentional tort."  *Garnett v. Gov't Employees Ins. Co.*, 186 P.3d 935, 944 (Okla. 2008).

The "critical question" in any bad faith tort claim is "whether the insurer had a good faith belief, at the time its performance was requested, that it had a justifiable reason for withholding [or delaying] payment under the policy."  *Ball*, __ P.3d __, 2009 WL 1679954, at * 5 (internal quotations omitted); *see also Garnett*, 186 P.3d at 944 (explaining that "[t]he essence of the tort is the unreasonable, bad-faith conduct of the insurer" and that a "central issue is whether the insurer had a good faith belief in some justifiable reason for the actions it took or omitted to take").  "If there is a legitimate dispute concerning coverage or no conclusive precedential legal authority requiring coverage, withholding or delaying payment is not unreasonable or in bad faith."  *Ball*, __ P.3d __, 2009 WL 1679954, at * 5.  "The tort of bad faith hence does not prevent an insurer from

11

denying, resisting or litigating any claim as to which the insurer has a reasonable defense." *Id.*

"Before the issue of an insurer's alleged bad faith may be submitted to the jury, the trial court must

first determine as a matter of law, under the facts most favorably construed against the insurer,

whether the insurer's conduct may be reasonably perceived as tortious." *Garnett*, 186 P.3d at 944.

AAA has not moved for summary judgment on either Plaintiff's underlying breach of

contract claim, conceding that a question of fact exists as to the first element – whether Plaintiffs

were actually entitled to UM benefits. For purposes of this motion, AAA also concedes that a

question of fact exists as to the causation element. AAA's motion is based on Plaintiffs' inability

to establish either the second or third elements of a bad faith claim – namely, whether AAA had a

reasonable basis for delaying or denying Plaintiffs UM benefits and whether AAA dealt fairly and

in good faith with Plaintiffs. The Court will address each Plaintiff separately.

A.     Joyce

Joyce alleges a bad-faith denial of UM benefits under the Policy.[8]  Pursuant to Oklahoma

law, UM coverage "applies in the situation where the tortfeasor is without insurance or where the

tortfeasor has insufficient insurance to satisfy the claim of the insured." *Buzzard v. Farmers Ins.*

*Co., Inc.*, 824 P.2d 1105, 1110 (Okla. 1991); *see also* Okla. Stat. tit. 36, § 3636. "Both uninsured

and underinsured coverage are first-party coverage intended to protect the insured from loss incurred

because of a third-party tortfeasor." *Buzzard*, 824 P.2d at 1110. By statute, UM coverage is

"available for that amount of injury or damage which exceeds the liability limits of the tortfeasor."

*Id.* at 1112. In determining whether a claim filed with the underinsurer exceeds the liability limits

---

[8]     Plaintiffs' briefing makes clear that their bad-faith claim arises from AAA's handling of their
        UM benefits and not AAA's handling of Med Pay benefits or property damage benefits.

of the tortfeasor, "the underinsurer must take prompt action to determine what payment is due and may not delay the payment of benefits until exhaustion of [the tortfeasor's] liability limits." *Id.* In other words, "[t]he underinsurer may not safely await settlement between the liability insurer and the insured." *Id.* "Instead, the insurer must go about the business of investigating and evaluating the claim" because "[a]n insurer is readily equipped to make such a determination, and to assign a dollar value to the claim." *Id.* "Once this is accomplished, if the insurer determines that the claim does not exceed liability limits, and such valuation is supported by reasonable evidence, the underinsurer may delay payment." *Id.* "However, if the underinsurer does not conduct an investigation, or after investigation, determines that the likely worth of the claim exceeds the liability limits, prompt payment must be offered." *Id.*

In this case, Doublehead's liability coverage was $25,000 for each Plaintiff. In determining whether Joyce was entitled to UM coverage, AAA had the obligation to investigate and determine whether her claim exceeded $25,000. AAA contends that, even assuming it reached an incorrect determination as to the ultimate value of Joyce's claim for UM benefits as less than $25,000 and therefore breached the contract in denying her UM claim, it had a reasonable basis for doing so – namely, the Assessment performed by Brocato and Brocato's consideration of all medical bills submitted by Joyce. In other words, AAA contends that it had a "legitimate dispute" with the insured over the value of her claim.

The Court concludes, based on the facts as construed against the insurer, that AAA's conduct may be reasonably perceived as tortious by a fact finder. Construing the facts in favor of Joyce, Brocato ignored or disregarded certain of Benner's opinions in the 8/2/07 Letter, and she did so

13

without the support of an independent medical examiner.[9]  For example, Brocato's claim notes state, or at least imply, that Joyce's "prior issues" played a role in the denial of coverage.  (Claim Notes, Ex. 7 to Def.'s Mot. for Summ. J., at 20.)   However, the only medical opinion in the record regarding Plaintiff's current condition and its cause is the 8/2/07 Letter by Benner.   Such letter concludes that "although [Joyce] received physical therapy [her]complaints cleared and [she was] back to baseline with no additional complaints or impact on [her] lifestyle or work until August of 2005, at which time [she was] stopped, and rear-ended."  (8/2/07 Letter, Ex. 9 to Def.'s Mot. for Summ. J., at 3.)  Construing Benner's conclusion in the light most favorable to Joyce, it is directly contrary to Brocato's conclusion.[10]  In addition, although AAA submitted medical records regarding prior injuries in support of its motion for summary judgment, (*see* Part I.A *supra*), it did not submit evidence or testimony regarding precisely who at AAA considered these records and precisely when they were considered during the claim-handling process.  (*See* Def.'s Mot. for Summ. J. ¶¶ 1-5.)  A more developed record will shed light on Brocato's precise knowledge and consideration of the medical records attached as Exhibits 1-2 to Defendant's motion.

Further, Brocato stated in claim notes that she felt Joyce's claim was "excessive for the soft tissue injuries" that she was diagnosed.  (Claim Notes, Ex. 7 to Def.'s Mot. for Summ. J. at 23.)

---

[9]     Construing the facts in the light most favorable to Joyce, Brocato had possession of the 8/2/07 Letter at least by the time of her last denial of UM coverage on November 13, 2007 and possibly at the time of the Assessment on August 10, 2007.  Even assuming she received the 8/2/07 Letter after the Assessment and the drafting of certain relevant claim notes, it is not disputed that Brocato failed to revisit her prior findings upon receipt of the 8/2/07 Letter.

[10]     In its reply brief, AAA argues that, "[g]iven the context, the 'baseline' to which [Benner] refers is likely [Joyce's] condition prior to her 2004 side-impact motor vehicle accident since [Benner] was well aware of [Fell's] prior diagnosis and treatment of [Joyce]."  (*See* Reply in Support of Mot. for Summ. J. 4.)  However, this argument simply underscores the need for a finder of fact to consider and interpret the meaning of the 8/2/07 letter.

14

Again, however, this stated reason could be considered contrary to the 8/2/07 Letter by Benner, which indicates that an MRI scan "demonstrated the disc changes at C5-6 and C6-7 with some narrowing of the canal" and that these changes produced "a potential for [Joyce] to have *nerve root* irritation or injury when [her] neck was brought through a range of motion in the accident." (8/2/07 Letter, Ex. 9 to Def.'s Mot. for Summ. J., at 3 (emphasis added).)  Therefore, at least two of Brocato's contemporaneously stated reasons for denying Joyce's claim could be considered by the trier of fact as contrary to the opinion of Joyce's treating physician.

Notably, AAA did not hire an independent medical examiner to examine Joyce, and Brocato's conclusions are therefore not supported by any expert medical opinion in the claim file at the time of her decision to deny coverage.  Instead, construing the facts and the 8/2/07 Letter in favor of Joyce, Brocato simply disagreed with Brenner's medical opinion.  This case is therefore distinguishable from AAA's principally cited case, *Sims v. Travelers Insurance Company*, 16 P.3d 468 (Okla. Ct. App. 2000) (affirming grant of summary judgment in favor of insured based on insured's "legitimate dispute" as to the amount of claim).  In *Sims*, the court granted summary judgment on a bad-faith claim because, *inter alia*, there was "a dispute among the medical professionals regarding whether the accident was the cause" of the plaintiff's condition, and both parties "submitted evidence of their respective valuation of the claims in their evidence to support their briefs on this subject."  *Id.* at 471.  In this case, the summary judgment record does not conclusively demonstrate a "dispute among the medical professionals."  Instead, the summary judgment record consists of (1) several medical evaluations conducted by various doctors years before the Accident, without specification of the details regarding AAA's review of such records,

(2) Joyce's treating physician's opinion regarding the plaintiff's current condition and its cause, and

(3) Brocato's "dispute" with the treating physician's medical opinion.

Finally, Brocato's Assessment itself does not assign any value to future care, despite Benner's opinion that steroid treatments on February 28 and July 18, 2007 were caused by the Accident and Benner's statement that he would "continue to treat" Joyce on a "regular basis." (8/2/07 Letter, Ex. 9 to Def.'s Mot. for Summ. J., at 3.)  Therefore, Brocato's conclusion in the Assessment that Joyce's claim totaled  $14,521- $16,621 apparently did not take into account Benner's opinion that future steroid treatments or surgery may be necessary.  Again, Brocato's assignment of a "$0" value to future care, without any supporting medical opinion to contradict Benner's opinion, could be considered unreasonable rather than the subject of a "legitimate dispute." Further, it is undisputed that at some point prior to AAA's last denial, Joyce's claimed actual medical bills totaled $17,000.  If Joyce had $6,300 - $8,400 in "General Damages," as Brocato concluded in the Assessment, and even a small amount of damages for future care, her claim would exceed the $25,000 tortfeasor limit.

Under the circumstances presented – namely (1) stated reasons for denial that are contrary to a treating physician's opinions and are not supported by an independent medical evaluation, and (2) claimed actual medical bills that are within $8,000 of the tortfeasor's limit and a treating physician's opinion of the possibility for ongoing care – the Court finds that reasonable minds could differ as to whether AAA had a "legitimate" coverage dispute with Joyce, or whether AAA acted unreasonably in denying the UM claim.

The Court also finds that reasonable minds could differ on whether AAA dealt fairly and in good faith with Joyce during the entire claim-handling process.  It is disputed whether AAA ever

16

informed Joyce of the possibility of UM benefits under the Policy.  The file was repeatedly "closed" upon final payment of Med Pay benefits, with no mention in the claim notes of the need to keep the file open and evaluate ongoing medical bills for purposes of UM coverage.  Joyce was allegedly frustrated and confused as to why she was limited to the $5,000 Med Pay benefits and was told by AAA to hire an attorney.  The record indicates that, until Joyce hired an attorney and such attorney demanded UM benefits, AAA made no effort to investigate or evaluate the possibility of UM coverage.  While these facts standing alone may not be sufficient, the Court finds them sufficient in combination with Brocato's conduct in connection with the eventual investigation of the UM claim.  Such conduct included actions that could be considered contrary to the only relevant medical opinion in the file.  Under these circumstances, a reasonable fact finder could conclude that AAA failed to conduct a reasonable investigation of Joyce's claim and/or failed to deal fairly with her. *See Buzzard*, 824 P.2d at 1109 (explaining that, in determining the validity of a claim, "the insurer must conduct an investigation reasonably appropriate under the circumstances"); *see also Thompson v. Shelter Mut. Ins.*, 875 F.2d 1460, 1462 (10th Cir. 1989) (explaining that a fact finder "may be shown the entire course of conduct between the parties to arrive at a determination" of whether the good faith standard has been breached or not).

B.     Phillip

        Phillip also alleges a bad-faith denial of UM benefits under the Policy.  However, based on the undisputed facts, Phillip's claim for bad faith fails as a matter of law because no rational fact finder could conclude that AAA had an unreasonable basis for denying his UM claim.  First, Phillip's claimed total medical bills never exceeded $5,000 at any point prior to AAA's denial. Therefore, even assuming Phillip's condition of tinnitus was caused by the Accident, there was a

17

$20,000 difference between his actual medical bills and the tortfeasor limit.  In addition, AAA was

not in possession of any medical opinion that Phillip's treatment for tinnitus would be ongoing.

Therefore, Brocato's conclusion that "underlying limits are $25/$50 and I believe it is clear, based

on what has been submitted so far, that UIM will not apply in this case," (*see* Claim Notes, Ex. 7

to Def.'s Mot. for Summ. J. at 20), could not be considered unreasonable under the circumstances.

Second, there is no evidence that, by the time his claim was denied, Phillip had submitted a medical

opinion to AAA indicating that his tinnitus was caused by the Accident.[11]  Therefore, Brocato's

conclusion that she was "not convinced" that the tinnitus was "accident related" was not

unreasonable as a matter of law, (*see id.*), and any dispute between AAA and Phillip regarding the

value of his claim was "legitimate" as a matter of law.  There is simply no evidence that would lead

a reasonable fact finder to conclude that AAA denied Phillip's UM claim in bad faith.[12]

### C.    Punitive Damages

"[T]he Oklahoma Supreme Court has explained that punitive damages are not justified in

every case where the issue of bad faith is present."  *Miller v. Liberty Mut. Fire Ins. Co.*, 191 P.3d

1221, 1227 (Okla. Ct. App. 2008).  This is because the culpability required for a finding of bad faith

is something "less than the reckless conduct necessary to sanction a punitive damages award."

[11]    Plaintiffs' Exhibit 16 is a letter from Dr. William Sawyer concluding that Phillip's "tinnitus was directly related to the automobile accident injuries."  (Ex. 16 to Pls.' Resp. to Def.'s Mot. for Summ. J.)  However, this letter was sent to Phillip on July 24, 2008, well after AAA's last denial of coverage and after the filing of this lawsuit.  It is therefore not relevant to whether AAA acted in bad faith at the time of denying coverage.  *See Hale v. A.G. Ins. Co.*, 138 P.3d 567, 571-72 (Okla. Ct. App. 2006) (explaining that "the cutoff for relevant evidence is the date of payment or denial of the claim" and that "[t]he duty of good faith and fair dealing exists during the time the claim is being reviewed").

[12]    Because the Court finds that Phillip cannot satisfy the second element of a bad faith claim, the Court need not reach the third element.

*Badillo v. Mid-Century Ins. Co.*, 121 P.3d 1080, 1094 (Okla. 2005).  However, for the same reasons explained above, the Court finds that Joyce's evidence, construed in its most favorable light, could at least give rise to a finding of recklessness, which is sufficient to support a punitive damages award.  *See* Okla. Stat. tit. 23, § 9.1(B)(2) (allowing punitive damages award if "an insurer has recklessly disregarded its duty to deal fairly and act in good faith with its insured").  Therefore, the Court will not preclude Joyce's punitive damages claim at this stage of the proceedings.

Defendant's Motion for Summary Judgment (Doc. 27) is GRANTED IN PART and DENIED IN PART.  It is GRANTED as to Phillip's claims for bad faith and punitive damages and DENIED as to Joyce's claims for bad faith and punitive damages.

**IT IS SO ORDERED this 7th day of October, 2009.**

**TERENCE KERN**
**United States District Judge**

19